JOHN FAWCETT *vs*. THE SUPREME SITTING OF THE ORDER
OF THE IRON HALL.

Third Judicial District, New Haven, January Term, 1894. ANDREWS, C. J.,
TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

The defendant, an Indiana corporation, was organized as a secret and fra-
ternal society with numerous local branches in this and other States.
Among its corporate purposes was the establishment of a "benefit
fund" raised by assessments on the members of the various branches
who elected to become participants in that fund, and from which such
members were each to receive a sum not exceeding one thousand dol-
lars, payable at such times and in such amounts as the laws of the Order
and the certificate of membership prescribed. Eighty per cent of each
assessment was remitted by each branch to the treasury of the corpo-
ration and the remaining twenty per cent called the "reserve fund"
was retained and invested by the respective local branches, subject to
the call of the corporation in installments at stated intervals for its
use in paying its benefit certificates maturing in the future. The de-
fendant having become insolvent, F. was appointed by an Indiana court
receiver of all its assets, and subsequently S. was appointed receiver in
this State and the "reserve fund" in the custody of the local branches
was paid over to him by order of court. The two receivers and the
local branches having interpleaded their respective rights to this fund,
and the case having been reserved for the advice of this court, it was
*Held* (*one Judge dissenting*) :—
1. That the contract evidenced by the certificate was one between the holder
and the corporation, and that the promise of the latter for the ultimate
payment of the stipulated benefit did not depend upon the sufficiency
of the "reserve fund" of the particular local branch to which the holder
belonged, nor was it secured by any pledge of such fund.
2. That such "reserve fund," whether in the custody of the branches or
in the hands of the general officers of the corporation, was a trust fund
applicable solely to the payment of certificate holders, and, so long as
the corporation was a "going concern," was held in trust for them
generally, without distinction between members of different branches.
3. That if the corporation were a "going concern" and able by making as-
sessments and with the aid of these several trust funds held by the local
branches, to discharge the trust for the benefit of its certificate holders,
it would be the duty of the Connecticut receiver to remit such funds
in his hands to the proper general officers of·the Order. But as the
corporation was insolvent, disorganized and unable to carry out the
purposes of its incorporation, the payment of assessments having stop-
ped and the Order having become practically dissolved, it was incum-
bent on the courts of this State to see that no injustice would be done

to its own citizens who were certificate holders, by remitting the funds to the custody of the Indiana receiver for distribution under the orders of the Indiana court.

4. That it was not clear that, under the orders and decrees of such court as they appeared on the record, the certificate holders in this State would be fully protected in their rights, in case the funds were remitted to the custody of the Indiana receiver; especially since such orders and decrees did not apparently recognize the orders of courts in other States as a justification for the delay of the local branches in those States in accounting to the Indiana receiver, and made no distinction, as to those entitled to share in the funds that might come into his hands, between general creditors of the Order and its certificate holders.

5. That the local branches in Connecticut from whom the receiver in this State collected the funds in controversy, had the right to be amply protected by the court in obedience to whose decree they made such payments; and that this right extended equally to the certificate holders in such branches by whose contribution these funds were created.

6. That the performance of the contract of the Order with its certificate holders having by its fault become impossible, each certificate holder had the right to elect whether to treat the contract as rescinded and demand a return of what he had paid on it, or to treat it as in force and claim damages for its non-fulfillment.

7. That the unanimous election of the Connecticut certificate holders to adopt the former course, had been sufficiently and seasonably made known by the answers and claims filed in their behalf by the several branches and trustees.

8. That as against a foreign receiver and assignee, the members of each branch whose contributions created its "reserve fund," had, under the condition disclosed in the record, an equitable lien upon it, which the courts of their own State could best protect; and that equity would best be promoted by retaining this fund in the hands of the Connecticut receiver for distribution among those certificate holders of the Order, by whose contributions it was accumulated.

9. That the constitution, laws and rules of the Order did not disclose upon their face that its scheme was fraudulent in offering to certificate holders more than the assessments to be made upon them could justify; and that in the absence of any finding by the trial court showing the existence of fraud in its contracts or management in this State, this court could not presume or infer that its dealings had been of so fraudulent a character as to deprive the Indiana receiver on that ground of all right to claim the funds in controversy.

10. That the standing of the defendant and of its Indiana receiver was not affected by § 2892 of the General Statutes, prohibiting foreign life or accident insurance companies from doing business in this State unless authorized by the Insurance Commissioner; since § 2903 excepted every "secret and fraternal society" from such prohibition.

11. Such a corporation does not stand in the same relation to its certificate holders as that occupied by a life insurance company to its policy hold-

ers, since it relies for the means of paying the stipulated benefits, not on the accumulation of premiums paid, but on assessments to be levied by no fixed rule, upon the different branches of the Order under a system incapable of application after it had ceased to be a "going concern."

12. That the claim of F., the Indiana receiver, should be disallowed.

13. That the funds in the hands of receiver S. should be distributed, after payment of necessary costs and charges, among the holders of benefit certificates outstanding and obligatory on the corporation at the date of the commencement of the Indiana receiver's suit; payments to be made to the certificate holders of each branch in proportion to the amounts paid by them respectively for assessments, less such dividends or benefits, if any, as each certificate holder might have previously received under his certificate.

[Argued January 17th—decided March 6th, 1894.]

ACTION for the appointment of a receiver of the assets of the defendant corporation in this State; brought to the Superior Court in Fairfield County and tried to the court, *Ralph Wheeler, J.;* facts found and case reserved for the advice of this court.

Upon the plaintiff's application Edwin L. Scofield was appointed receiver of the funds and estate of the defendant in Connecticut, and thereafter the branches of the Order in this State, pursuant to the order of the Superior Court, paid over to him as such receiver all the funds in their custody. Thereupon the several local branches and James F. Failey, the receiver previously appointed by the Indiana court, where the defendant corporation was organized and had its principal offices, interpleaded their respective claims to the funds turned over to the receiver in this State.

The other facts are sufficiently stated in the opinion.

*Henry C. Robinson* for James F. Failey, the Indiana Receiver.

I. The claim made by the domiciliary receiver is sound by every principle of law and equity.

The reserve fund, neither in whole nor in part, ever belonged to any branch. The entire membership of the Order owned the entire fund wherever held, and, as such owners, mutually limited their right to call it in to accomplish its

purposes, to certain periods. These purposes are now lost, and with the loss the limitations fall out, and the owners of the property own it now without limitation upon its use.

There is nothing inconsistent with the claim of title in the Order, in the fact that the branches were authorized to select trustees and that their bonds ran to the branches. The branches were merely the agents of the Order. *Schunck* v. *Withoen and Waisen Fund*, 44 Wis., 369; *Erdman* v. *Ins. Co.*, 44 Wis., 376; *Lyon* v. *Sup. Ass. R. S. G. F.*, 153 Mass., 83.

II. The principal receiver is the successor of the corporation which owned the reserve fund. He is also the successor of the parties who created the fund; and is vested by the decree of the domiciliary court with all the funds held by the branches.

To order these funds to be distributed upon State or any other geographical lines would make hotch-pot of the property. The small branches would jostle the large ones, the older certificates would jostle the younger ones, and no single individual would or could get his just share.

III. The rights of receiver Failey are paramount, and the court will assist to enforce them.

The law is now well settled that, under the principle of comity, the courts of one jurisdiction can recognize the authority and permit the exercise of functions of a receiver appointed in another jurisdiction, except in those cases where a court of the former jurisdiction finds that its own policy will be displaced or the rights of its own citizens invaded or impaired. This is especially true when such receiver is, by the terms of his appointment, to gather the assets wherever found. *Hurd* v. *Elizabeth*, 41 N. J. L., 4; *Boulware* v. *Davis*, 90 Ala., 207; *Sercomb* v. *Catlin*, 128 Ill., 562; *Bank* v. *McLeod*, 38 Ohio St., 184. It is altogether unnecessary that the property should be within the jurisdiction of the court making the original appointment. *Bank* v. *McLeod, supra; Haulditch* v. *Donegal*, 8 Bligh. N. S., 343; Beach on Receivers, §§ 17, 18, 19; High on Receivers, §§ 47, *et seq.*

IV. Where the corporation is chartered by a single State and does business through agencies and through branches organized by itself in other States, if it becomes insolvent its assets should be gathered at the domicil and there distributed according to the principles of equity. *Relfe* v. *Rundle*, 103 U. S., 222; *Rundle* v. *Life Ass. of America*, 10 Fed. Rep., 720; *Davis* v. *Life Ass. of America*, 11 Fed. Rep., 781; *Taylor* v. *Same*, 13 Fed. Rep., 493; *Bockover* v. *Same*, 77 Va., 85; High on Receivers, § 50; *Peale* v. *Phipps et al.*, 14 How., 374; *Parsons et al.* v. *Charter Oak Life Ins. Co.*, 31 Fed. Rep., 305; *Fry* v. *Same*, 31 Fed. Rep., 197; *In re Equitable Reserve Fund Ass.*, 131 N. Y., 369; *Jepson* v. *Fraternal Alliance*, 17 R. I., 471; *Burdon et al.* v. *Safety Fund Ass.*, 147 Mass., 300; *Fogg* v. *Supreme Lodge, Order of Golden Lyon*, 22 Ins. Law J., 848; *Chamberlain* v. *Lincoln*, 129 Mass., 70; *Karcher* v. *Sup. Lodge, Knights of Honor*, 137 Mass., 368; *Oliver* v. *Hopkins*, 144 Mass., 175; *Sup. Lodge K. of P.* v. *Kalinski*, 57 Fed. Rep., 348; *Stamm* v. *N. W. Mut. Ben. Ass.*, 65 Mich., 317.

So sacred are the rights of individual members in these benevolent associations, that the courts hold that one cannot be dissolved in the absence of organic provisions, except by the unanimous consent of the members. *Allman* v. *Berry*, 27 N. J. Eq., 331; *State Council* v. *Sharp*, 6 Am. & Eng. Corp. Cases, 629; *Thomas* v. *Ellmaker*, 1 Pars. Sel. Cases, 98 (Penn.); *Gouland* v. *De Varia*, 17 Ves., 19.

*William F. Henney, Lucius P. Deming* with whom was *James Bishop*, and *Henry G. Newton*, for the Connecticut Branches of the Order.

BALDWIN, J. The Supreme Sitting of the Order of the Iron Hall was duly incorporated under the general laws of the State of Indiana, in 1881. Its corporate purposes were defined, in the third of its Articles of Association, as being "to unite in bonds of Union, Protection and Forbearance all acceptable white persons of good character, steady habits, sound bodily health, and reputable calling, who believe in a

Supreme Intelligent Being, the Creator and Preserver of the Universe; to improve the condition of its membership morally, socially and materially, by instructive lessons, judicious counsel and timely aid, by encouragement in business, and by assistance to obtain employment when in need; to establish a Benefit Fund from which members of the said Order who have complied with all its rules and regulations, or the heirs of such member, may receive a benefit in a sum not exceeding one thousand dollars ($1,000), which shall be paid in such sums and at such times as may be provided by the laws governing such payment, or in the certificate of membership, and when all the conditions regulating such payment have been complied with."

Its "proper officers" were to have "power, at any time when a liability on account of the sickness, disability or maturity of certificate of a member entitled to a benefit under number three of these Articles occurs, to make the proper and specified assessment, under the prescribed regulation, to meet such liability."

By Article II, sec. 3, of the "Constitution" of the Order, duly adopted pursuant to its Articles of Association, one of its objects was particularly declared to be "to establish a Benefit Fund from which those who have held membership in the Order for thirty days or more may, should they so desire, on proper application, and complying with all the rules and regulations governing said Benefit Fund, become participants therein and may receive the benefit of a sum not exceeding twenty-five dollars per week, nor more than *one half* of the sum total held by each member, when, by reason of disease or accident, they become disabled from following their usual occupation, or an amount of not more than one thousand dollars when they have held a continuous membership in the Order for seven years. *Provided, however*, That the sum total drawn from this Order by any of its members shall never exceed, both in sick, disability, and other benfits, the sum named in the certificate of membership."

Among the "Laws of the Supreme Sitting," made pursuant to its Constitution, were the following:

## "Law I.

### "BENEFIT FUND.

"Section 1. There shall be attached to this Order a Benefit Fund, in which members may participate (except social members), as they may severally elect, either in the sum of one thousand dollars, eight hundred dollars, six hundred dollars, four hundred dollars or two hundred dollars, on which they shall pay the rates and be entitled to the benefits prescribed in the following table. The members of the Sisterhood Branches (except social members) may participate in the Benefit Fund, as they may severally elect, either in the sum of six hundred dollars, four hundred dollars or two hundred dollars, on which they shall pay the rates and be entitled to the benefits prescribed in the following table : *Provided*, That all payments shall be made in accordance with the following sections, and in no other way or manner:

### " *Table of Rates and Benefits.*

| Amount Paid on Each Assessment. | Weekly Benefit when Sick or Disabled. | Amount Paid on Total Disability. | Payable at Death. | Benefits Paid at End of Seven Years not to Exceed |
|---|---|---|---|---|
| $2.50 | $25.00 | $500.00 | $500.00 | $1,000.00 |
| 2.00 | 20.00 | 400.00 | 400.00 | 800.00 |
| 1.50 | 15.00 | 300.00 | 300.00 | 600.00 |
| 1.00 | 10.00 | 200.00 | 200.00 | 400.00 |
| .50 | 5.00 | 100.00 | 100.00 | 200.00 |

## "Law II.

### "RESERVE FUND.

"Section 1. Twenty per cent of the amount received by each Branch on each assessment shall be set aside and retained as a Reserve Fund. At the expiration of the first term of six years and six months from the date of the organization of the Order, one seventh of the reserve Fund then on hand shall be called for by the Supreme Accountant and

Fawcett v. Iron Hall.

used by the Supreme Cashier in the payment of benefits, and annually thereafter one seventh of the Reserve Fund on hand shall be called for, and used in like manner.

"Sec. 2. Each Branch shall have supervision of the Reserve Fund, and when said Reserve Fund shall amount to fifty dollars, the Trustees, in conjunction with the Cashier of the Local Branch, shall invest the same in registered United States Government bonds, county and city bonds, in first class mortgages on real estate, or it shall be deposited at interest in some reputable savings bank: *Provided*, That no loan shall be made for a longer period than six years from the end of the term to which said Reserve Fund belongs, interest to be computed, or paid, semi-annually. Should a loan be made on real estate, it shall be on first mortgage, and not exceed one half of the taxed value of said real estate. No Local Branch of the Order shall loan any portion of its Reserve Fund on chattel mortgages, and any Local Branch that shall allow its officers to loan any of the Reserve Fund or its accumulations contrary to law shall be declared suspended by the Supreme Justice, and shall not be reinstated until all funds are safely secured to the Order as the law directs.

"Sec. 3. Each Branch may remit its Reserve Fund to the Supreme Cashier for investment by the Supreme Trustees to the credit of said Branch, charging him with the amount of such Reserve Fund so remitted for investment, and the Supreme Cashier shall receipt for the same on an official blank for that purpose. The Supreme Trustees are hereby empowered to invest said funds in accordance with Section 2 of this law.

## "Law I.

"Sec. 2. When the amount received for one assessment, less the Reserve Fund, as Provided for in Law II, Section 1, shall equal an amount less than one thousand dollars, the sum to be paid shall in no case exceed the amount of one assessment, less the reserve. In such case, if the member's certificate be in the amount of one thousand dollars, he shall

receive not more than the whole amount of said assessment; if in the amount of eight hundred dollars, not more than four fifths of said assessment; if in the amount of six hundred dollars, not more than three fifths of said assessment; if in the amount of four hundred dollars, not more than two fifths of said assessment; and if in the amount of two hundred dollars, not more than one fifth of said assessment; and said amounts shall be all that can be claimed by any one.

"Sec. 4. Each member of the Benefit Fund on becoming liable; shall pay to the Accountant the amount prescribed in the foregoing table on account of the Benefit Fund, and the same amount on each assessment thereafter while he remains a member of this Order. The Accountant shall keep the date when such payment is made, and credit the member with the same in the books provided for that purpose.

"Sec. 5. The sum as prescribed in the member's certificate shall be paid to the member, his widow, or the legal heirs of said member, in case of sickness, disability or maturity, and such payment shall be made as hereafter prescribed; and according to the conditions set forth in said certificate.

"Sec. 6. On the sickness or disability of a member, or the maturity of a certificate, the Accountant of the Local Branch shall immediately notify the Supreme Accountant upon the official blanks provided for that purpose by the Supreme Sitting, giving full particulars and the date of the last assessment paid by said member.

"Sec. 11. On receipt of duly approved claims for sickness or disability, or maturity of certificate of a member, the Supreme Accountant shall draw an order on the Supreme Cashier in favor of the proper person or persons for the amount due, signed by the Supreme Justice, and forward the same to the Accountant of the Local Branch of which the beneficiary is a member: *Provided*, That in case of continuous sickness or disability, a member shall be entitled to present a claim for benefits at intervals of four weeks or less, and shall be entitled, when approved, to a payment on account of said claim, for which the member shall give to the Supreme

Sitting a receipt in full of said payment, and in all cases it shall be charged upon the Benefit Fund ledgers of the Supreme Accountant and Supreme Cashier.

" Sec. 12. Upon receipt of the order for the payment of a sickness or disability benefit, or a matured certificate, the Accountant shall immediately turn the same over to the person or persons in whose favor it is drawn ; before delivering the order, he shall obtain a receipt in full of said payment on the certificate, and instruct the member to forward the warrant to the Supreme Cashier for payment: *Provided,* That in cases of the maturity of certificate, when the payment cancels the certificate, the certificate duly canceled and attested by the officers of this Local Branch, must accompany the warrant for collection.

" Sec. 14. After paying any of the above benefits, if the Supreme Treasury requires, an assessment shall be made ; the Supreme Accountant shall make a call on each Local Branch for the money of each member belonging to the Benefit Fund. Such call shall be in accordance with a form prescribed by the Supreme Sitting, and shall include a list of all claims received for adjustment subsequent to the last assessment.

" Sec. 15. Whenever an assessment is called for, the Accountant shall certify to the Cashier the amounts due the Supreme Treasury on account of the Benefit Fund by the terms of the call of the Supreme Accountant. The Cashier of the Local Branch shall thereupon immediately forward to the Supreme Cashier the amount so certified by the Accountant, and at once notify the Accountant of this Branch in writing of the amount so forwarded. A Branch failing to comply with this section within thirty days shall stand suspended from that date until all arrearages are paid. And should a Branch fail to pay all arrearages within thirty days from the date of suspension, they shall be declared defunct, and the Reserve Fund, charter, and all other property shall be at once demanded by the Supreme Accountant in accordance with laws governing the same.

" Sec. 16. When an assessment is made it shall be the duty

of the Accountant to at once notify every member liable to the said assessment that the same has been issued.   Assessment notices shall bear the seal of the Branch, and shall be upon the blanks furnished by the Supreme Sitting, and its date shall be the same as that of the notice received from the Supreme Accountant.   Each member who fails to pay the assessment called for, to the Accountant, within thirty days from the date of the notice, shall stand suspended without further notice.   Any Branch failing to enforce the law against any member who becomes delinquent on assessments shall pay out of its general fund all assessments and fines which become due from such member, and which are not paid by them, so long as they are permitted to remain in good standing.

### " Law V.

" Sec. 8.  Any Branch failing to comply with the Constitution and Laws of this Order, after becoming suspended, shall become liable to the Supreme Sitting for all that appears in its Benefit, Reserve and General Fund accounts, as kept by the Supreme Accountant, and more, if so shown by the accounts of the Branch ; and does hereby agree, should suit be instituted against such Branch, upon proper proof of the correctness of the account, to confess judgment for the same and all costs incurred by the Supreme Sitting in making such collections, and that each officer and member thereof agrees thereto to become immediately responsible to the Supreme Sitting for the whole amount of such judgment."

Each local branch annually elected, among other officers, an Accountant, Cashier, and three Trustees ; and the " Constitution governing Local Branches " contained the following provision :—

### "Article V.

" Sec. 10.  The trustees shall have the general supervision of all the property of this Branch.   They shall, in conjunction with the Cashier, invest in such securities as they know to be safe such sums as this Branch orders drawn from the treasury for that purpose.   They shall have the custody of all securities of this Branch for money loaned or invested,

except, should the Branch become suspended, they then go into the hands of the Supreme Trustees. They shall collect or realize all such sums when so directed by this Branch. They shall collect all the interests, rents or other money arising from said investments belonging to this Branch, and pay the money collected by them to the Accountant. They shall, on the 30th day of June and the 31st day of December of each year, report their transactions to this Branch, and make an inventory of all property. Before entering upon the duties of their office they shall each give bond, with approved security, for such sum as this Branch may require for the faithful performance of their duties, *provided,* the sum shall not be less than five hundred dollars each, which bond shall be approved by the Branch and deposited with the Supreme Justice."

Every member electing to participate in the "Benefit Fund" received, on the application of his "Branch," a certificate from the "Supreme Accountant," in a form, duly prescribed by the Supreme Sitting, reading as follows:

"Supreme Sitting $1,000.00

No. of the

ORDER of the IRON HALL.

Membership Certificate.

"THIS CERTIFICATE is issued to _____ a member of Local Branch No. _____ ORDER OF THE IRON HALL, located at _____, State of _____. Upon evidence received from said Local Branch that _____ _____ was duly initiated on the _____ day of_____, 189___, and upon the conditions that the statements made by him in his application for membership in said Local Branch and the statement certified to by him to the Medical Examiner, both of which are filed in the Supreme Accountant's office, be and are hereby made a part of this contract, and upon conditions that the said member complies with all the laws, rules and regulations now governing said Local Branch and its funds; and that said member further agrees to comply with all future laws that may be hereafter enacted by the

Supreme Sitting to govern said Branch and funds. These conditions being fully complied with, the Supreme Sitting Order of the Iron Hall hereby promises and binds itself to pay out of its Relief and Reserve Funds a sum not exceeding

ONE THOUSAND DOLLARS

in accordance with and under the provisions of the laws of the Order governing such funds and their payments, upon satisfactory evidence of the sickness, disability or death of said member, or upon its termination, upon the proper receipt of partial payments made thereon, and upon the surrendering of the Certificate at its legal termination: Provided that said member is in good standing in this Order and provided also, that this Certificate shall not have been surrendered by said member to any other person or persons except in case of death to his legal heirs in accordance with the laws of this Order.

"It is fully understood and agreed that the mailing of notices of assessments to the last known residence or address of the member ten days prior to the expiration of the time named therein, within which the payment called for thereby should be made, or the personal delivery of such notices three days prior to said expiration of time, shall be a final and legal serving of the same, and when so mailed or delivered, all responsibility of the Order, or any Branch or officer thereof, shall finally cease and determine.

"This Certificate shall be in force from its date, when attested by the signatures of the Chief Justice and Accountant, and an impression of the Seal of the above named Branch and accepted by the afore-mentioned member all in accordance with the form printed thereon. If not so attested and accepted, within three months from its date, it shall become *ipso facto*, null and void, and of no effect whatever.

"IN WITNESS WHEREOF, We have hereunto attached our signatures, and affixed the Seal of the Supreme Sitting of the Order of the Iron Hall, this _____ day of _____; A. D. 189___.

(Seal)  E. J. WALKER,                    F. D. SOMERBY,
       Supreme Accountant.              Supreme Justice.

"I accept this Certificate on the conditions named herein, to take effect on the _____ day of _____ 189___, on which date I became a Beneficial Member, in accordance with the Laws of the Order.

" Witnessed and delivered in our presence,

```
--------------------------               Of
            Chief Justice.        Local Branch
--------------------------      No. ---------------
            Accountant.           O. I. H.
```

--------------------------------------

Signature of Member."

On the back of this paper was printed the following form of a receipt for the payment of the benefits stipulated, on a final settlement:

"FINAL SURRENDER. .

"RECEIVED OF _____ Cashier of Local Branch No. _____, ORDER OF THE IRON HALL, Benefit Fund Warrant No. _____, on the Supreme Cashier of said Order, in the sum of _____ Dollars, the same being in full of all claims against the SUPREME SITTING of the ORDER of the IRON HALL, or against any Branch or officer of said Order, which exists under or on account of the within Membership Certificate, which is hereby surrendered.

--------------------------

Person Receiving Benefit.

"We hereby certify that the person who has signed the above receipt and surrender is the proper (Seal of Branch) party to receive the Benefit, and that _____ signature is genuine.

```
-------------------------        -------------------------
        Accountant.                     Chief Justice."
```

All the funds now in the hands of the Connecticut receiver were collected by him from local branches of the Order in this State, or from trustees appointed by them, and belonged to the " Reserve Funds " held for the benefit of Members of the Order who had elected to take benefit certificates.

It is plain that the contract set forth in these certificates is one between the holder and the Supreme Sitting of the Order of the Iron Hall, and that the promise of the latter for the ultimate payment of the stipulated benefit is not made dependent on the sufficiency of the Reserve Fund of the particular local branch to which the holder belongs, nor secured by any pledge of such fund. If the entire Reserve Fund of any local branch should be lost, by unfortunate investments, whether made by the local trustees, or the "Supreme Trustees" of the corporation, its obligation to meet the certificates held by members of such branch would be unaffected. Of the assessments payable from time to time under Law I, sec. 1, eighty per cent went immediately into the treasury of the corporation, to reimburse it for payments already made on matured certificates, or to be used for the payment of certificates as they might mature, without any discrimination between the members of different branches. The remaining twenty per cent was to be retained and invested subject to be drawn upon, in favor of the Order, only to the extent of one seventh of its total amount annually, which was to be "used by the Supreme Cashier in the payment of benefits."

Each local Reserve Fund was therefore a fund held in trust for the payment, through the general officers of the corporation, in its behalf, and out of its treasury, of benefits to certificate holders. In the hands of the receiver appointed by the Superior Court, it stands, of course, charged with the same trust.

If the corporation were now in a condition to fulfill its obligations to certificate holders, by the aid of the several trust funds held by the local branches, and to discharge the trusts upon which it might receive them, according to the terms of the certificates and the rules of the Order, it would be our duty to advise that the receiver in this State should remit all moneys in his hands to the proper officers of the Order. But the corporation is insolvent, and unable to carry out the purposes of its organization; and has assigned all its right and title to these funds to James F. Failey, a citizen of In-

diana, who had previously been appointed by a court of that State, receiver of all its estate, wherever situated.

Mr. Failey, as such receiver and assignee, has appeared as a defendant in this cause, and claims the funds.

Before the courts of Connecticut can sanction such a change of trustees, they must be satisfied that no injustice would thus be done to the citizens of their own State. The local branches and trustees, out of whose charge these funds have been taken by the order of the Superior Court, have appeared before us, and in behalf of those whom they represent, unanimously object to any transfer to the Indiana receiver. By the decree of the court under which he, Failey, was appointed, made on August 23d, 1892, he was ordered to collect all Reserve Funds in the hands of any local branches, whether within or without the State of Indiana, and all such branches were ordered to pay the same to him, and enjoined from any other disposition of them. He was also required to report to the court any instance of neglect to comply with the terms of such order, on the part of any person or branch, " when such further order will be made in such behalf as to the court shall in such case seem meet." All branches making such payments by October 10th, 1892, were to be entitled to share in the distribution of the estate. On December 2d, 1893, another decree was passed in the same suit, confirming that of August 23d, as to the provisions above mentioned, except that the receiver was directed to inform the courts in other States, which had appointed receivers of the corporation, of the terms of both decrees, and request them, and the receivers by them appointed, to account to him, and to pay over to him all moneys in their hands, " to be by him taken and held, together with the funds on hand, as the property of said defendant, the Supreme Sitting of the Iron Hall, which moneys, together with all the other moneys coming to the hands of said receiver herein, shall be hereafter equitably distributed among the creditors and certificate holders of the said defendant." All members of local branches thereafter properly accounting for and paying over to him, within a reasonable time, all money and property in their

possession, or who had accounted, or might within a rea-
sonable time account, in any other State to any local re-
ceiver, who thereafter, within a reasonable time, should
account for the same to Mr. Failey, as principal receiver,
were declared entitled to share in the distribution of the
funds in the latter's hands, when made, equally and ratably
" with the creditors and certificate holders of the said de-
fendant corporation." Any neglect or refusal of any courts
or receivers to comply with the request of the Indiana re-
ceiver for a transfer to him of the funds in their custody,
he was " directed with due speed to report," whereupon such
order was to be made " as at such time may seem proper."

These provisions of the decree were predicated on a finding
that "attachment and receivership suits have been brought
against the defendant, the Supreme Sitting of the Order of
the Iron Hall, in very many States and jurisdictions through-
out the United States, and that in such proceedings the courts
have taken into possession and control the property of the
said defendant, the Supreme Sitting of the Order of the Iron
Hall, in such States and jurisdictions, and now hold the
same under the orders of the various courts."

The following facts are also set forth in the same finding:—
At the commencement of the suit in Indiana, which was on
July 29th, 1892, there were over a thousand local branches
of the Order in different parts of the United States and Can-
ada, of whose members over sixty thousand held benefit cer-
tificates. The Order had received nearly six million dollars
net, from these certificate holders, and their certificates called
for benefits which, at the *maximum* rate, would amount to
about $49,000,000. To meet these obligations the Order
had in its treasury, to the credit of the " Benefit Fund,"
about a million dollars, according to its books; of which,
however, owing to fraud and mismanagement, less than a
quarter of a million was available. It also had on hand
nearly $350,000, belonging to the " Reserve Fund," and the
several local branches had under their control further sums
belonging to the same fund, to the aggregate amount of
$1,360,000. The other funds of the Order amounted to but

about a quarter of a million dollars. The several local "Reserve Funds" held in Connecticut amounted to $18,667.05, and the Connecticut certificate holders who had paid it in, had therefore contributed to the "Benefit Fund" $74,668.20, which had been remitted to the general treasury. They numbered 1098. Four of the Connecticut branches had accounted to the Indiana receiver, and paid over to him, together, over $3,000. Two of them, after his appointment, distributed the "Reserve Funds" in their hands among their members. All of them have ceased to hold regular meetings, and to carry out the purposes of their organization.

On February 25th, 1893, Mr. Failey filed in the Superior Court, in the present action, his claim to all the funds in its custody, in which he states that they belong to him as principal receiver, "for the benefit of all the creditors of the corporation, to be distributed according to the constitution and laws of the corporation; and that no particular branch anywhere situated has any claim to the reserve fund, but that the same and all reserve funds belong to the Order."

The local branches in Connecticut, from whom or whose trustees the Connecticut receiver has collected the funds in controversy, have a right to be amply protected by the court in obedience to whose decree they have made such payments; and this right extends equally to those by whom these funds were originally contributed—the certificate holders, who became such as members of these branches.

The first Indiana decree proposed to admit to a share in the distribution of the funds coming into the hands of the Indiana receiver, those having property of the Order in their possession who accounted to him by October 10th, 1892. The decree of December 2d, 1893, extended the limit to "a reasonable time" after notice from him of his claims. Such notice was given to the parties to this suit a year or more ago, by the pleadings on file. The Indiana decree does not appear to recognize, as a justification for delay in such accounting, the orders of courts in other States having jurisdiction of the parties in interest. It seems also to make no distinction, as to those entitled to share in the funds that

may come into the hands of the Indiana receiver, between general creditors of the Order, and the holders of its benefit certificates.

In opposition to the claim of Mr. Failey, it has been urged in argument that he is before us in the position of a plaintiff, having no better rights than the Order of which he was appointed receiver, and has since become the assignee; and founding his title to recover the funds in controversy upon a fraudulent compact, namely, the scheme under which the Order was organized and conducted. The fraud is said to consist in the offer to certificate holders of more than the assessments to be made upon them could justify; and it is argued that if they were parties to the wrong, they occupy in this cause the position of defendants, in possession of the fund, so far as equitable right is concerned, and may therefore invoke the protection of the rule, *In pari delicto melior est conditio possedentis.* But the certificates contain no promise to pay any particular sum, nor do the constitution or laws of the Order impose any limit on the number of assessments that can be laid. The obligation of the corporation —so far as appears from the face of the papers which express it—would be satisfied by paying the holder of a matured certificate any sum, however small, and its right to enforce contribution from him is only limited by reference to the necessities of the treasury on account of previous payments on other certificates.

There was no representation that the assessments or other funds of the Order, except the twenty per cent Reserve Fund, were to be left to accumulate, to provide means for the ultimate payment of what might become due on certificates. On the contrary, it was expressly stated that such assessments were to be used to reimburse the Order for prior expenditures. The obligations of each year were to be discharged by the use of four fifths of the assessments of the year, and the remaining fifth only was to be kept for future recourse. In ordinary contracts of life insurance, where a fixed sum is promised, in consideration of fixed premiums, payable at stated intervals, the maintenance of an adequate

and accumulating reinsurance reserve is an essential part of of the plan; but what is known as " co-operative insurance " proceeds upon a different theory, and relies mainly upon the assessments and lapses of each year to meet the calls for maturing benefits.

It has also been argued that if there be no fraud apparent in the constitution, rules, and laws of the defendant Order, yet its whole dealings in this State have been of so fraudulent a character as to deprive its assignee and receiver of any right to claim the funds in controversy by an appeal to the doctrine of comity. The Superior Court has found that the Order was duly incorporated under the laws of Indiana; and it has not found any facts showing as matter of law the existence of fraud in its contracts or management in this State. It is evident that the rules and laws of the corporation are such as to furnish an easy means for designing men, if placed in official positions, to entrap the unwary by false and alluring representations as to the large returns to be derived from small contributions. The seal of the Order, displayed on the benefit certificates, and on the pamphlet containing the constitution, rules and laws, bears upon its face the device of a safe with the figures " $1,000." at its top, and beneath it the words " *in seven years*." One of the rules, which provides that if two assessments are laid in any month, the first shall be laid on the first day of the month, and the second on the fifteenth, might easily give a casual reader the impression that in no month could more than two assessments be laid, whereas treble that number could hardly suffice to provide for the maximum benefits. But while these are all circumstances entitled to great consideration, upon any inquiry into the truth of charges of fraud against the officers of the Order, they do not establish its existence as a conclusion of law. Fraud is never presumed. The place to prove it, in a case like this, is in the Superior Court, and the record of the proceedings in that court fails to show that the charge now made was there maintained.

Nor do we think the standing of the corporation, or its receiver before us, is affected by General Statutes, § 2892, by

reason of the fact that it has done business in this State without authority from the Insurance Commissioner, though it may have been incorporated in another State for the purpose, among other things, of furnishing insurance on the assessment plan. Every " secret or fraternal society " is excepted from the operation of that statute by General Statutes, § 2903, and the defendant corporation appears to us to be one answering both these descriptions. " Secret work " by Article XI of the constitution is one of the functions of the " Supreme Sitting," and the branches are to meet with a " Watchman " at the outer and " Vedette " at the inner door.

But while restricted as we are to the consideration of questions of law, we cannot say that there was fraud in the original purposes of the defendant corporation, or in its dealings in this State, nor that there was any statutory impediment to its doing business here ; the comity which permitted it to come here to organize its local branches and contract with their members, does not require us, in determining the consequences of such contracts, in view of its present position, to overlook the claims of citizens of Connecticut to the protection of its courts. The controversy before us is as to the possession of a trust fund in the hands of the court. The trusts upon which it is held will be the same, whoever may be the trustee. It is made up of several smaller funds, each of which was under the control and management of local trustees in this State, until the court required them to surrender it to its receiver. He now, as regards the claim of Mr. Failey, represents their rights, as well as those of the *cestuis que trustent*. These local trustees were properly constituted, and no act of maladministration is alleged against them. If their possession could not be disturbed by the Indiana receiver, neither can his be. *Cooke* v. *Warner*, 56 Conn. 234, 239. The contract between the certificate holder and the corporation was, by its express terms, made subject to the rules and laws of the Order. For its due performance, on the part of either party, it was necessary that the corporation should maintain its connection with the local branch to which the holder belonged, and continue in active

existence as a " going concern." Payments upon the certifi-
cate were to be made out of a " Benefit Fund " raised by
assessments levied by the corporation on the several local
branches, on account of those of their members who held
certificates. The local branch was required to forward 80
per cent of the total amount called for " immediately," to
the " Supreme Treasury " of the corporation, and to notify
each certificate member of the call, whereupon he was obliged
to pay the amount of his assessment to the branch within
thirty days from the date of the original call. Twenty per
cent of this was to be left with trustees appointed by the
branch, and under bonds to its " Chief Justice " and " Vice
Justice." The bonds were all payable to these officers " in
trust for said branch," should the trustee fail to account for
the funds, at the end of his term, to his " successor in office
or to whoever may be legally appointed to receive the same."
Assessments were to be levied only when previous payments
by the corporation out of the Benefit Fund had so reduced
it that it required to be replenished. The amount to be paid
on each matured certificate was also to be determined, with-
in a certain maximum limit, by the managers of the corpora-
tion ; and as it was to be liquidated by means of an order on
the " Supreme Cashier," drawn by the " Supreme Account-
ant," and signed by the " Supreme Justice," it would seem
that the corporation intended to reserve some discretionary
power to regulate the sum by the state of the treasury.

It is obvious, as we have already said, that the corporation
looked to the calls upon certificate holders in each year, for
the means to pay the benefits accruing during the year, and
to maintain the " Reserve Fund," which, with the aid of
lapses, it was hoped would avoid the necessity of any bur-
densome multiplication of assessments. In 1892, upon the
insolvency of the corporation and the appointment of re-
ceivers in different States, the receipts from assessments
stopped, the branches generally ceased to meet, and the Or-
der became disorganized, and practically dissolved. The
carcass remained, but the life was gone. The end was reach-
ed, so far as the rights of certificate holders are concerned,

on July 29th, 1892, the day when the suit was instituted in Indiana for the appointment of a receiver. In view of the condition of the corporation at the time, and the probability of such an appointment, no certificate holder could have been expected to make any future payment to it for assessments.

The performance on its part of the contract of the Order with the certificate holders having by its fault become impossible, each of these had the right to elect whether to treat the contract as rescinded and demand a return of what he had paid on it, or to treat it as in force and claim the damages resulting to him from the corporation having put itself in a condition incompatible with the fulfillment of its engagements. 2 Saunders on Pleadings and Evidence, *674; *Lyon* v. *Annable*, 4 Conn., 350, 355. The Connecticut certificate holders, represented before us through the several trustees or branches who have appeared or pleaded in the cause, have unanimously elected the former course, and such election has been sufficiently and seasonably made known by the answers and claims which have been filed. Under these circumstances, we think equity will best be done, as between the parties before us, by retaining the funds in controversy in the hands of the receiver appointed by the Superior Court, for distribution among the certificate holders of the Order, by whose contributions they were originally accumulated. *In re Equitable Fund Life Association*, 131 N. Y., 354; 30 Northeastern Rep., 114, 120; *Lindquist* v. *Glines*, 23 N. Y. Suppl., 272; *Peltz* v. *Supreme Chamber of the Order of Financial Union*, 19 Atlantic Rep., 668; *Fogg* v. *Supreme Lodge of Order of Golden Lion*, 156 Mass., 431; 33 Northeastern Rep., 692, 693.

For every dollar paid by them to the accountant of their local branches, eighty cents has been transmitted to the general treasury of the Order, to reimburse it for benefits paid to other certificate holders, and twenty cents has been reserved to meet similar claims to mature thereafter. It is to the reserve funds thus constituted that contributors, electing to rescind the contract evidenced by their benefit certificates, have a right to look primarily for repayment of their ad

vances.   These funds were manifestly left, by the laws of
the Order, in the hands of the local branches for their better
assurance.   As against the demand of a foreign receiver and
assignee, we think the members of each branch whose con-
tributions created its Reserve Fund, have, under the condi-
tions disclosed in the record of this cause, an equitable lien
upon it, which the courts of their own State can best pro-
tect, especially where he claims it for distribution among the
creditors of the corporation generally without any distinc-
tion in favor of certificate holders.

In quoting the constitution and laws of the defendant
corporation, the edition of 1888 has been followed.   We
have not found it necessary to consider the effect of the
changes of phraseology found in later editions, and which it
is claimed were made without authority ; since, while they
might serve to strengthen the legal title of the corporation
to the custody of the various Reserve Funds, they cannot
vary the trusts upon which they were created and must be
administered.

The Superior Court is advised to direct the distribution
of the funds now in the hands of Edwin L. Scofield, receiver,
after payment of necessary costs and charges, among the
holders of benefit certificates, issued by the Supreme Sitting
of the Order of the Iron Hall, to them as members of
branches of the Order organized in Connecticut, and out-
standing and obligatory upon said corporation on July 29th,
1892 ; payments to be made out of the fund received from
the trustees of each local branch to the certificate holders of
that branch, in proportion to the amounts paid by them re-
spectively for assessments, laid upon them as holders of such
certificates, deducting from such dividends, in each case,
such amount, if any, as the certificate holder may have pre-
viously received from said Order by reason of his rights
under his certificate ; and to dismiss and disallow the claim
of James F. Failey, receiver of said corporation by appoint-
ment of the Superior Court for Marion County in the State
of Indiana, to said funds or any part thereof.

In this opinion ANDREWS, C. J., TORRANCE and FENN, Js., concurred.

HAMERSLEY, J. (dissenting). In the result announced by the majority of the court I concur, but not with the reasons given in support of that result.

If the funds in question were accumulated by the defendant corporation in the transaction in this State of a business lawful under our laws, then such funds ought to be placed in the hands of Mr. Failey, the principal and domiciliary receiver appointed by the Indiana court; unless there are facts in the case which establish some clear ground of exception to the general rule.

The rule that when a corporation is chartered by a single State and does a lawful insurance business in other States through agencies and becomes insolvent, its assets should be gathered at the domicil, and there distributed according to the principles of equity, is sound and should be universally observed. It is based upon a recognized principle of international comity; and that principle as applicable between our several States, rests on reasons far more cogent than the reasons which support the principle as applicable between nations wholly independent. While it is true that for many purposes our States are independent, as really as if they were for all purposes separate sovereignties, and for this reason the rules of international comity may apply to questions arising between citizens of different States, yet it is also true that the citizens of all the States are fellow subjects of one common government, supreme within the sphere of its operation, and that the necessities growing out of such common government impose upon the several States obligations of the highest authority, inconsistent with that cautious and self-protecting administration of the law of comity that may be safely indulged in by States wholly foreign to each other. The full faith and credit positively given in each State to the judicial proceedings of every other State; the good faith and confidence impliedly required in dealing with such judicial proceedings; the commercial necessity of a

distribution of assets of an insolvent corporation by one court, growing out of the guaranteed freedom and infinite variety of commercial intercourse; the impossibility in many cases of an equitable distribution except by one court; the concurrent jurisdiction, and at times exclusive jurisdiction, of Federal courts in such cases, all suggest cogent reasons for a loyal observance of the rule stated, unless the particular facts present a plain and unquestioned exception to the rule.

It will not, however, be necessary to inquire whether the particular facts in this case do, or do not, present such exception. Mr. Failey practically appears in this matter as a plaintiff; and, as the foundation of his claim and right to the assistance of this court, sets out in full the organization, constitution and laws of the defendant corporation, and a record containing the findings, orders and decrees of the Indiana court.

The Durham Branch, in its demurrer, says, that upon the documents set out by Failey, in connection with the findings, and orders of the Indiana court, it appears that the business transacted in this State was unlawful and contrary to public policy; and also in its claim alleges as a fact that the defendant corporation was not organized and qualified to do business in this State.

The Superior Court has made a finding of facts for the purpose of submitting to this court the whole record, with the facts set forth in the finding, and of obtaining the advice of this court upon all questions arising upon the pleadings and record; including the questions arising upon the demurrer and the overruling thereof, and the question of what judgment upon the facts found should be rendered.

In the finding of facts the court finds, in addition to the facts otherwise appearing on the record, that the Indiana court had made certain further findings of fact, conclusions of law, and orders, which should be added to the record set out and relied upon by Failey in his claim, and makes such findings of fact, conclusions of law and orders a part of this record; and also finds that of the funds on hand $———

were accumulated in 1889 and subsequently; (it was stated in argument, and not questioned, that this blank should be filled by a sum representing nearly the whole amount accumulated) and that the corporation has never been authorized to do insurance business in this State.

Thus the main and determinative question we are called upon to decide is upon the facts contained in the record and found by the court:—Should the Superior Court now hold that the business transacted in this State by the insolvent corporation was a business contrary to our public policy? This question requires that we should first come to an understanding of the meaning and legal effect of the remarkable mass of words called the constitution and laws of the Order of the Iron Hall. They contain the articles of association—*i. e.*, the charter of the corporation, the constitution adopted by the corporation, the constitution prescribed by the corporation for governing local branches, the general laws adopted by the corporation for its own government, and the few special laws governing delegated meetings of local branches, called district meetings, to be from time to time called by officers of and subject to the control of the corporation; special laws governing the life division— which do not appear to have been put into operation; and an official summary of the effect of the constitution and laws in a number of enumerated cases. The meaning of this literature cannot be understood without the most thorough analysis of the whole and every part, and it is too voluminous to be quoted in full; but I am satisfied that a careful examination of the documents establishes the following conclusions:—

1. The defendant was incorporated in December, 1881, by filing articles of association in pursuance of a general statute of Indiana authorizing the incorporation of three or more persons for the purpose of organizing "divisions or associations of temperance, or other charitable associations or orders." The members of the corporation so organized consist, for all practical purposes, of its principal officers. The stated meetings of the corporation are biennial or quad-

rennial, and the officers are re-chosen at such meetings. Eight specified officers must receive salaries, and may receive other compensation. A body called the executive committee exercises all powers of the corporation concerning business matters, fixes the salaries and compensation of all officers, and is composed of nine officers, of whom six are of those required to be salaried.

2. The corporation undertakes to accomplish two distinct, though related objects : First, to organize and govern local branches of a secret social society ; second, to establish and carry on an insurance business on the assessment plan, in which the insured must first have been admitted members of the secret society, and must continue in good standing as such members.

3. While the secret social society is under the absolute control of the corporation, the members of the society are not members of the corporation, and the corporation assumes no liability to furnish them the pecuniary aid usually provided by fraternal and mutual aid societies. The members of the society, as such, are called " social members." One of their privileges is the right to apply for insurance—i. e., to become " participant in the benefit fund," and by the laws governing the secret society such insured members have the exclusive right to vote and hold office, the privilege of paying dues being common to all the members. The constitution provides that any person who has held a membership in the society for thirty days or more may, if he so desire, become a participant in the benefit fund. To become such participant he must make application, undergo medical examination, sign the obligations relating to conditions of insurance, etc., in the same manner as in the transaction of any insurance business, and the corporation states in its official summary of its laws that before insurance the insured must become " an acceptable social member of the order, which is purely fraternal ; " and that after being a social member thirty days " he may, if he so desire, make application to become a member of the benefit fund ; " or, at his option, he may remain a social member for life, and " as such social

member he would enjoy all the fraternal and social privileges of the order." And again, " social members shall pay the same dues as the members of the benefit fund, and cannot vote or hold office, neither are they entitled to any benefits for sickness or disability." It is through the local branches of this secret society that the corporation secures its agents, and revenue for pushing its scheme of insurance. Each member, whether insured or not, pays into his local branch various fees and dues, by which all its expenses in maintaining attractive social features and drawing in candidates for the insurance business of the corporation, are provided for. It is also through these local branches that the corporation provides the revenues which it uses for its corporate expenses and to divide as salaries and compensation among the corporators. For such purposes the branches pay the corporation charter and registration fees, profits on the sale of paraphernalia and supplies, and such *per capita* tax on all members, whether insured or not, as the corporation sees fit to levy. It is necessary to keep in mind these distinctions. The secret society is not the corporation. The society supplies the corporation with funds for the use of the few corporators, but the corporation is by its laws forbidden to give to members of the society any pecuniary aid in case of sickness, accident or death. No element of benevolence, charity, or mutual aid exists between the corporation and members of the society. The insurance business is a business distinct from the organization of the secret society, and is transacted directly between the corporation and its certificate holders, just as truly as if the business were carried on, as has been done in connection with the Masonic fraternity, by a corporation having no connection with the fraternity, beyond the fact that its field of insurance is confined to the members of the fraternity in good standing. These distinctions between the corporation and the secret society, between the corporation as the organizer of the secret society and as the manager of the insurance business, are clearly deducible from the constitution and laws submitted to us; although those docu-

ments are well calculated and perhaps intended to obscure and conceal such distinctions.

4. The insurance business established and carried on by the corporation, consists in issuing certificates whereby the corporation undertakes to pay the holder $1,000, in seven years, upon condition that the holder shall pay all assessments of $2.50 when called upon in pursuance of the laws made by the corporation, and upon the further condition that he shall continue a member in good standing of the secret society organized and controlled by the corporation. In order to attract the savings of the very smallest earnings, provision is made for issuing similar certificates for the payment of one, two, three, or four fifths of $1,000, upon condition of paying assessments of one, two, three, or four fifths of $2.50. The obligation of the corporation also involves the payment of certain weekly sums in case of the disability of the certificate holder; but as the whole amount so paid can in no case exceed one half of the sum named in the certificate, and in every case must be deducted from the sum agreed to be paid on its termination, this provision does not affect the character of the principal agreement. The obligation also involves the payment of one half the amount named in the certificate in case of the death of the holder after the first two years of the term; but this provision only covers a life risk for one and one half, or at most, for five years; and in view of the small percentage of mortality in any one term of five years, cannot seriously affect the principle of the insurance. The substantive business consists in the payment of a fixed sum at the end of seven years. The subsidiary provisions may furnish an excuse for calling the business accident and life, as well as endowment insurance, but are in fact mere incidental attractions for the prosecution of the main scheme, which the whole literature of the corporation, as well as the seal, indicative of its main object described in the charter, authoritatively announces to be the payment of "$1,000, in seven years." The corporation promises to pay $1,000 in seven years in consideration of the payment of the assessments of $2.50 each, and upon the

representation that those assessments shall not in the aggregate equal $1,000. Counsel claim that the corporation does not promise to pay $1,000, but only a sum "not exceeding $1,000." I think this error arises mainly from a misapprehension of the effect of the certificate. That paper, it is true, contains a promise to pay "a sum not exceeding $1,000," but it contains no promise as to the time or as to any detail. The only promise is to pay a sum "in accordance with and under the provisions of the laws" of the corporation, and this paper is authenticated by the seal of the corporation, which contains the charter, declaration of its main purpose and object, "$1,000 in seven years." To the laws we must look for the actual promise. The law says:—"There shall be attached to this Order a benefit fund, in which members may participate (except social members), as they may severally elect, either in the sum of $1,000, $800, etc., on which they shall pay the rates and be entitled to the benefits prescribed in the following table:"

"TABLE OF RATES AND BENEFITS.

"Amount paid on each assessment,       .    .      $2.50
   Weekly benefit when sick or disabled,   .      $25.00
   Amount paid on total disability,       .    .   $500.00
·  Payable at death,    .    .    .    .    .       $500.00
   Benefits paid at end of seven years not ex-
      ceeding,  .    .    .    .    .    .        $1,000.00"

Here is a direct promise that the certificate holder shall participate in the fund "in the sum of $1,000," and "shall be entitled" to $25.00 a week during sickness, $500 on total disability, $500 at death ; (the obligation to pay these sums is absolute, it is not a mere promise to pay a sum not exceeding $500), and at the end of seven years benefits not exceeding $1,000—i. e., the benefits remaining unpaid of the sum of $1,000 which he has elected as the sum which specifies his participation in the benefits. No other construction can be given this language except as a subterfuge for palpable fraud —and such construction the court cannot give. And this construction of the direct promise of "$1,000 in seven years"

is fully confirmed by a careful examination of the whole body of the laws. The only exception to the obligation is contained in the section which provides that when one assessment of $2.50 shall realize an amount less than $1,000, if the certificate be in the amount of $1,000, the certificate holder shall receive no more than the " whole amount of said assessment." That is, until the business increases so as to include more than 400 certificate holders, (the number necessary to produce $1,000 at $2.50 each,) each certificate holder whose claim matures must be content with the product of one assessment; and the insertion of this exception is strong affirmation that the promise to pay the whole sum named in the certificate is binding in every other case.

Counsel also claim that the business scheme of this corporation does not involve the representation that assessments imposed on the certificate holders shall not in the aggregate equal $1,000. There is no foundation for such a claim. We are called upon to declare the legal meaning of a body of laws prepared for the sole purpose of attracting and building up a large business. The purpose for which such laws are framed is as truly an element in their construction as the contextural meaning of the particular language used to accomplish that purpose. In passing on the character of the business disclosed by laws so framed, we are bound to exercise that knowledge of the patent, well established and universally recognized elements of human nature, and of business transactions which the court must be presumed to possess. In this case the business, the securing of which is the object and sole object of the laws, consists in obtaining from a large number of the public the payment to the corporation of $2.50 from time to time upon the promise by the corporation of paying to each contributor $1,000 at the end of seven years. It is certain that such a business cannot exist without the belief on the part of the contributors that the assessments of seven years will be less than $1,000. By the very fact of offering to the public, for the purpose of obtaining business, the prospectus contained in these laws, the corporation makes the representation that $1,000 is to be obtained in seven

years by contributing in small sums less than that amount.
Such representation is written into their prospectus by the
fact of publication, unless it is clearly excluded by the lan-
guage used. It is true the corporation might have said:
" This business cannot honestly be carried on without col-
lecting from each contributor in assessments the full amount
of $1,000." If this language had been used no business
would have been done and the laws would not be before us
for construction. Not only is no such language used, but the
representation implied in the very fact of presenting this
business to the public is plainly set forth in the laws of the
corporation. The law providing for the payment of assess-
ments says : " All payments shall be made in accordance with
the following sections, and in *no other way or manner.*" And
until the laws are changed no assessment can be made except
as provided. The only provision for calling for payment of
assessments is that if the treasury requires an assessment
shall be made, and that " when it is evident from the claims
filed in regular form that two assessments are necessary in
any one month, then it shall be the duty of the supreme ac-
countant to make the calls for said assessments at the same
time, dating the calls one on the 1st and the other on the
15th of the month, except when those dates occur on a Sun-
day or legal holiday, in which case they shall be dated the
preceding day." And in its official summary of the laws,
intended for those unable to wade through the whole mass
of legislation, the corporation says : " When it is necessary
to call two assessments in one month, they shall be issued
from the office of the supreme accountant on the first day of
such month, or as near thereto as may be expedient." Surely
it needs no argument to show that these laws not only con-
firm the representation made in the very fact of presenting
this scheme to the public, but contain the representation that
not more than two assessments a month—*i. e.,* $420 in seven
years, will be required to obtain the payment of $1,000, and
that therefore the laws make no provision for calling further
assessments.

In confirmation of the view taken, attention may be called

to the fact that the Superior Court has made a part of the record of this case, conclusions of law found by the Indiana court in the proceeding which Failey sets out as the basis of his claim.   These conclusions of law are :—

" 1. That the defendant, in the issuance of certificates of membership in the benefit fund in the finding of facts described, was engaged in doing a health, accident, life and endowment insurance business, and the same was neither charity nor benevolence within the meaning of the statutes and laws of Indiana.

" 2. That under the said contracts made by the defendant with persons holding certificates in the benefit fund, the defendant was bound to pay the full or gross amount severally named in said certificates, at the expiration of seven years from the date thereof, if then in force, less the payments (if any) theretofore made on such certificates on account of sickness or disability benefits. * * *

" 4. That the defendant is not a mutual company, in the sense that the certificate holders in its benefit fund are members of the (Supreme) Sitting of the Order of Iron Hall, as the certificates constitute contracts entered into by the defendant on the one part and certificate holders on the other part, of the legal tenor and effect stated in the second conclusion above."

We find therefore that the record and facts before us clearly establish the conclusion that the essential business carried on in this State by the corporation, was the issue of certificates promising the payment of $1,000 in seven years, upon condition that the certificate holder shall pay during that time assessments of the fixed sum of $2.50 each, for the purpose of enabling the corporation from the money so paid in assessments, to pay $1,000 as each certificate matures ; and that this business necessarily involved the representation that the aggregate of assessments in each case would be less than $1,000 ; and further involved the representation, in fact made in the conduct of the business in this State, that the aggregates of assessments in each case would not exceed $420.   The provision for a so-called " reserve fund " does

not affect the character of this business. That provision simply permits the reservation of one fifth of each assessment, one seventh of the money so reserved, to be used annually in payment of matured certificates for the purpose of reducing the amount of future assessments.

The difficulty with the business consists in the impossibility of paying $1,000, from assessments amounting to $420, or any sum materially less than $1,000; and this difficulty is not to be avoided by using one fifth of the inadequate assessments, at the rate of one seventh a year, for the purpose of reducing the inadequate assessments of the future.

Nor is the character of the business materially affected by so-called "lapses," i. e., the possibility of a certain percentage of certificate holders forfeiting the assessments paid, by neglect to continue such payments. If the business really depends on such lapses, and its object is to pay a large profit to matured certificate holders from money obtained by means of such lapses, then the business is unsound and dishonest. But the lapses are a necessary incident, and do not materially affect the character and result of the business. The percentage of such lapses is established by insurance experience; the main portion of such lapses must be at the beginning, and not at the close of the term; the security of the certificate holder must consist in maintaining, not in diminishing, the number of those liable to assessment; and a slight mathematical process will demonstrate that such lapses cannot prevent the eventual loss to some one involved in a business based on a principle of paying $1,000 for $500.

Such a business is clearly distinguishable from legitimate insurance. All insurance has a wagering element, and by the common law of this State wagering contracts are unlawful. In insurance, however, the wager is not the controlling element. The object of the contract is protection; in fire and other insurance of property, protection of the actual value of the property destroyed; in life insurance, protection of the value of a man's life to his family or his creditors.

But in any such case, if the element of protection is eliminated, if there is no insurable interest, if the contract is a

mere speculative bet on contingencies, if nothing but the wagering element remains, then the contract becomes obnoxious to the law which pronounces wagers illegal. In these certificate contracts there is no element of protection to property; it is a purely business speculation. The bait held out to the certificate holder is the hope of getting $1,000 without paying for it. He risks his little stakes of $2.50 (a small sum purposely fixed for bringing the temptation home to a great mass of the people), in the expectation of succeeding in the scramble for a thousand dollars in seven years.

This business is also distinguishable from that *quasi* insurance business, which really partakes more of the nature of investment or saving bank business, called endowment insurance. This is a comparatively new branch of insurance business; but in States where the standard of safety and solvency has been established by legislation, the law says, that for a $1,000 seven-year endowment insurance policy, issued at the age of 30, the company shall charge, and the insured shall pay, $125.74 each year until maturity; and that after deducting the current cost of insurance each year, the whole balance must be carefully invested and compounded at the standard rate of interest. Whether this particular regulation is essential to the conduct of the business or not, it is plain that the business of issuing $1,000 seven-year endowment policies indiscriminately to all persons between 18 and 65, on payments not exceeding $60.00 a year, cannot be honestly conducted; and such impossibility cannot be altered by calling premiums "assessments." Life insurance may come to be safely conducted on the assessment plan, and possibly human ingenuity may devise a scheme for safely conducting endowment business on that plan; but it is a mathematical certainty that the so-called endowment business this corporation has attempted to conduct, can only result in loss to the certificate holders.

Still more clearly should this business be distinguished from that of fraternal and mutual aid societies. The latter have no element of speculation; they are purely protective, and are based upon the necessity and duty of mutual aid in

time of trouble; and so act as powerful incentives in promoting that cultivation of thrift and mutual helpfulness which is essential to the prosperity and good order of society. For this reason they are favored by the law, and entitled to its protection. But the former has no element of protection, and is purely speculative. It seeks not to help the unfortunate, but to make profits out of their misfortunes, and tends directly to discourage thrift and promote that speculative spirit which is a serious danger to society. Between these two there is an impassable gulf, and not the least of the injury resulting from the business of this corporation is its direct tendency to discourage and weaken legitimate fraternal and mutual aid societies. This business, therefore, is nominally an insurance business, whose essential characteristics are : 1. The elimination of the protective element of insurance, so that the wagering element ceases to be incidental and becomes the controlling element. 2. The certainty of ending in a money loss to a large number of certificate holders.

Such conclusion is a mathematical certainty. If fourteen men agree to pay equal assessments into a common fund, so that at the end of seven years each one may draw out $1,000, it is evident that each will pay in the amount he draws out. Such agreement is harmless, but will never be entered into. If, however, a company issues its certificates promising to pay $1,000 in seven years upon the payment of such assessments as the certificates mature, and obtains fourteen certificate holders, one each year for fourteen years, and continues the business of collecting assessments and paying benefits until the last certificate matures, we have this result :—The first man pays $143 in assessments, and draws out $1,000—a net profit of $857 ; the last man pays $2,593 in assessments, and draws out $1,000—a net loss of $1,593 ; the first six men make a profit of about $3,000 ; the seventh and eighth pay in and draw out the same amount, and the last six lose about $3,000 ; and in any method adopted for putting in execution such a scheme, either the certificate holders draw out the same

amount they pay in, or some members make a profit out of the losses of others.

The subsidiary elements introduced by the defendant in its scheme may modify results, but cannot affect the principle. It is an inherent element in every such scheme that whenever the business closes, some one must be a loser. It is also certain that practically the business cannot be carried on without a rapid increase of members. As soon as. the limit of increase is reached the business must close, and so the extent of the loss will be great in proportion to the success of the business. When, to such a scheme is added the fact that the corporation which carries it on makes large gains, proportioned to the extent of its business, and induces the public to take its certificates by the representation that $1,000 will be so gained in seven years through the payment of a much less sum, the fraudulent character of the business becomes yet more apparent and far more dangerous to the public.

The facts found in the record before us strikingly illustrate the substantial fraud in which the business set forth in the pleadings must result. It appears from the statement contained in the record of the condition of this company at the time of the appointment of Failey receiver, that the corporation has received several hundred thousand dollars, used for corporate expenses and for division among its officers, and at the time of failure was in receipt of a revenue for such purposes of upwards of $60,000 a year; that a large number of the earlier certificate holders have received net profits averaging about $420 each; and that the 60,000 remaining certificate holders, if all the money collected for assessments and not paid out on matured certificates, is divided among them, must lose about $2,000,000. Such is the result of a few years successful business, when conducted with all the honesty which such a business will permit. This practically illustrates what the documents before us demonstrate, that the very essence of the business carried on in this State, and which now seeks the aid of the court of equity, is

paying unearned profits to the few from the losses of the many.

I believe no case has been decided upon the precise question whether such a business is contrary to public policy, but courts have plainly characterized its nature when opportunity has been given. In Massachusetts, in reference to a corporation doing a somewhat similar business, but organized under a peculiar statute of that State, the court says :—" It is not in our power to declare the business contrary to public policy, and a fraud on an unprotected part of the community, since the Legislature have authorized it, but it is well to understand with what kind of business we are dealing. No one who does understand it, we think, would hesitate to agree that all legislative conditions must be complied with strictly." *Fogg* v. *Supreme Lodge U. O. Golden Lion,* 156 Mass., 431. In New Jersey, in holding that a similar business was not within the meaning of the New Jersey statute authorizing the formation of benevolent and charitable institutions, the court says :—" How can it ever be said that the Legislature ever intended to allow the learned and skillful and financially able to make profit, under the guise of benevolence and charity, out of the unlearned and unskilled, and those who are so unfortunate as to suffer from financial disability ? After the fullest and most careful reflection I am unable to discover any method or principle of law by which this scheme can be sustained under this Act. With all due respect to the learned counsel who presented the case for the defendant, it seems to me that the scheme prescribed by the constitution and by-laws in this case, has more the appearance of a lottery than of a charity." *Peltz* v. *Supreme Chamber Financial Union,* 19 Atl. Rep. 671. In Pennsylvania, a corporation organized under a general statute authorizing incorporation for the purpose of " the maintenance of a society for beneficial or protective purposes to its members from funds collected therein," attempted a somewhat similar business, and the Court of Common Pleas, in revoking its charter, says :—" The leading feature about which all others cluster, is this vicious proposition to give

a man good money for nothing. This cannot be done as a business matter, honestly and fairly." And the Supreme Court, in sustaining the revocation of the charter, says :— " The auditor and the court below have sufficiently demonstrated that the only persons likely to be benefited by the scheme set forth in the charter are the officers themselves. It manifestly belongs to that class of associations, by far too numerous, the practical effect of whose operations is to enrich a few at the expense of confiding and ignorant people. Such corporations are ' unlawful and injurious to the community.' " *In re National Indemnity and Endowment Co.*, 142 Penn. St., 450.

We have before us now, a corporation which has carried on in this State the insurance business described, not as a system of mutual aid between the members of a mutual aid society, but independently, the society such as it is, simply defining the field of insurance ; and the question is distinctly raised—Is that business contrary to our public policy? In determining this question we are embarrassed by no unfortunate legislation directly or impliedly authorizing such business. It is a fundamental principle of our law that courts will not undertake to administer justice in behalf of one whose claim is based upon a violation of law, whether that law be a statute, a legal principle, or a rule of conduct based upon accepted views of sound ethics and public interest, which has been incorporated into our system of jurisprudence by force of the well established judicial recognition which defines our unwritten law. Courts are established to settle rights founded in law. They have no jurisdiction of violations of the law, except for the purpose of punishment. This principle is found in the earliest records of our law, and has been enforced and illustrated in innumerable cases.

That the transactions in question are in violation of law is plain. In the first place, the record finds that the corporation " has never been authorized to do insurance business in the State of Connecticut." Sec. 2892 of the General Statutes says :—It shall not be lawful for any foreign corporation, organized for the purpose of furnishing life or accident in-

surance, or indemnity upon the assessment plan, to do any business in this State unless authorized by the Insurance Commissioner. Counsel claims that this prohibition has no application, because of a subsequent section which says it shall not be construed to apply to any "secret or fraternal society, nor to any association organized for benevolent and charitable purposes whose members are employed by one or by one or more similar corporations," etc. I think an examination of the whole law clearly shows that the words "secret or fraternal society" include only the well known class of associations formed for dispensing aid or benefits to their members, and that the exception does not apply to a corporation doing an assessment insurance business distinct from the benevolent operations of any secret or fraternal society. It will hardly be claimed that the mere word "secret" is efficacious to exclude from the operation of the act any corporation that may choose to call its janitor a "watchman" or its doorkeeper a "vedette." But there is no exception to § 2905; and that section provides that no foreign insurance corporation shall, directly or indirectly, transact business in this State until it shall have first appointed, in writing, the Insurance Commissioner of this State its lawful attorney, on whom process may be served. The record shows that this has not been done. I do not wish, however, to seek a ground for violation of public policy in the mere failure to comply with such requirements, when the actual transactions have been in violation of rules of conduct touching the gravest interests of society, and which are as well established law as if expressed in the form of a statute.

The insurance business of this defendant cannot exist without resulting in a fraud. In cannot be conducted without untrue representations. It is essentially of a wagering nature. Its direct and necessary tendency is an unmitigated public injury. The evils resulting from mere wagering purchases of stock, and which the law condemns as absolutely illegal, are slight compared with the disaster that must follow schemes of insurance which can only be started by appeals to the gambling spirit of a whole people, and can only end

in widespread loss. The rules of a public policy which condemn this business are well settled by judicial decisions, and this case really involves no new application of such rules; but if, in fact, it were a case of new application, the public injury is so great, and the violation of plain principles of law so clear, that the court should not hesitate to make the application. In *Egerton* v. *Brownlow*, 4 House of Lords Cases, p. 161, Lord LYNDHURST says :—" The inquiry must, in each instance where no former precedent had occurred, have been into the tendency of the act to interfere with the general interest. The rule, then, is clear ; whether the particular case comes within the rule, it is the province of the court in each instance acting with due caution, to determine." And Lord Chief Baron, SIR FREDERICK POLLOCK, in the same case, page 149, says :—" After all these authorities, am I not justified in saying that, were I to discard the public welfare from my consideration, I should abdicate the functions of my office—I should shrink from the discharge of my duty ? * * * I think I am bound to look for the principles of former decisions, and not to shrink from applying them with firmness and caution to any new and extraordinary case that may arise."

The question before us is not raised by the conflicting claims of the certificate holder and the corporation as to the validity or legal effect of a particular contract, but it is raised by the application of this corporation, through its receiver, asking the aid of a court of equity, for the purpose of settling its affairs, to put him in the possession of money due on account of business transacted in this State. The facts set out in this application, and the finding of the Superior Court, clearly show that the business so transacted, was essentially fraudulent and in violation of our public policy. The courts of this State cannot assist those who prosecute their business contrary to its settled policy, either in the prosecution of that business, or after its prosecution has ceased. Courts of equity will give no aid even in adjusting the accounts in a partnership formed for such purpose. *Watson* v. *Murray*, 23 N. J. Eq., 257 ; *Anderson* v.

*Powell*, 44 Iowa, 20 ; *Watson* v. *Fletcher*, 7 Gratt., 1. And *a fortiori* they will give no aid to a foreign corporation, in obtaining possession of property claimed to have been acquired through such violation of law. The claim of Mr. Failey must therefore be denied.

There is no question raised as to the jurisdiction of the Superior Court to distribute the funds now in the hands of Scofield, receiver. There appear to be no creditors, and no parties in interest, except the contributors to these funds. It is alleged and shown that the only protection against the dissipation of these funds through a multiplicity of suits, lies in their distribution by order of court. It is doubtless true that in the complications now existing, the funds can be most speedily and justly distributed through receiver Scofield. Possibly the view I have taken of the case may involve some modifications of the directions for distribution announced by the court, but such modifications would not be of sufficient practical importance to justify discussion, or to furnish ground for dissent.

For the reasons stated, I concur in the advice given to the Superior Court.