PATRICK KANE ET ALS. *vs.* THE KNIGHTS OF COLUMBUS
ET ALS.

Third Judicial District, Bridgeport, October Term, 1910.
HALL, C. J., PRENTICE, THAYER, RORABACK and WHEELER, Js.

The terms of the contract between a fraternal benefit society and its members are to be determined by the constitution and laws of the society as they exist at the beginning of the membership, and as they may be lawfully amended from time to time thereafter, and by the agreements made pursuant thereto between the incoming members and the society.

The power accorded to such a society in its charter, to alter and repeal

Kane *v.* Knights of Columbus.

its constitution, by-laws, rules, and regulations, enters into and forms part of the contract of insurance between the society and its members, when the latter, as applicants for membership, promise not only to conform to and abide by the constitution and laws of the society as they then exist, but also as they may be thereafter altered or amended.

Such reserved power of amendment and repeal does not, however, give the society any right to adopt a by-law which will divest, impair, or disturb rights once vested in its members; for such a by-law would be unreasonable.

The statutes of this State contemplate the payment of death-benefit certificates from surplus or reserve funds derived from assessments.

Such surplus or reserve funds established by a fraternal benefit society pursuant to its charter and by-laws are trust funds of which the society is the trustee.

In the present case the defendant created two funds of a trust character, one of which, called the death-benefit fund, was set apart to meet ordinary death claims when the regular assessments proved to be insufficient, and the other, known as the mortuary reserve fund, was to be used to pay such death claims as might arise from epidemics or other extraordinary causes and events. *Held:*—

1. That such funds were held not only for the benefit of the contributors of the fund and their beneficiaries, but for all who might become certificate holders and beneficiaries during the life of the fund; and therefore such funds could not be apportioned and distributed until it was definitely determined that they would no longer be needed for the purpose for which they were created.

2. That in the absence of a specific finding that those funds were no longer needed to answer the purposes of the trust, neither fund could lawfully be distributed, nor could either be diverted by the society from the purpose for which it was established.

After each of these funds had reached considerable amounts the defendant adopted a different and sounder plan of insurance, which called for higher rates, and thereupon merged those two funds in a common fund into which all surplus accumulations went under the new plan, which thereupon became available to meet either ordinary or extraordinary death claims. *Held:*—

1. That it was neither unreasonable nor arbitrary for the defendant to change its system of rates for one which would better promote its ability to carry out its contracts.

2. That the mere fact that the increased rates of assessment adopted by the defendant bid fair to provide an ample surplus to meet death claims and maintain its solvency, as found by the trial court, was not equivalent to a finding that such reserve fund would never be required in an emergency to enable the defendant society to meet its maturing obligations.

3. That while the surplus death-benefit fund might properly be devoted to such purposes, the mortuary reserve fund could not be; and therefore its transfer to or merger in the common fund, all of which was made available for the foregoing purposes, constituted an unwarranted change in the object of the trust and an illegal diversion of that fund.

4. That such diversion did not entitle its contributors to a distribution of the fund, nor to have it set apart for their ultimate benefit.

Such a fund must be preserved to answer the purposes of its creation until it definitely appears that those have failed, or that the fund will never be required therefor. Should either of those contingencies arise, it will then be proper to invoke the aid of a court of equity to secure a proper distribution of the fund, if the society, upon request, refuses to make such distribution.

Courts are reluctant to interfere with fraternal benefit societies in matters of internal management, until the society itself refuses to perform its duty.

An irregularity in the adoption of a by-law of such a society cannot be taken advantage of by some of its members years afterward, especially if they have in the meantime continued their membership and acquiesced in the changes accomplished by its adoption.

Argued November 2d, 1910—decided March 8th, 1911.

SUIT to secure an accounting and distribution of certain insurance funds in the possession of the defendant corporation, alleged to belong in equity to the plaintiff and other members who had contributed thereto, brought to and reserved by the Superior Court in Fairfield County, *Curtis, J.*, upon a finding of facts, for the advice of this court. *Judgment advised for the defendant.*

The questions reserved for the advice of this court are two: 1st. Does the defendant corporation hold the funds in suit upon a trust, other than a trust in favor of all the insured members and their beneficiaries? 2d. Should there be an accounting and apportionment, distribution and application of such funds, the manner and method to be determined by the trial court?

The defendant is a fraternal beneficiary society organized under a charter granted by the General Assembly of Connecticut, March 29th, 1882, amended April 5th,

1889, February 24th, 1893, March 3d, 1897, and June 27th, 1907.

The charter of 1882 declared that the purpose of the corporation was to render "mutual aid and assistance to the members of said society and their families." The amended charter of 1889 recited that one of its purposes was to render "pecuniary aid to its members, and beneficiaries of members"; and this provision was re-enacted in the amendments of 1893 and 1907. The amended charter of 1889 provided that "said corporation for the purpose of more effectually rendering aid and assistance to its members may establish, accumulate, and maintain a reserve or other fund in such manner and to such amount as it may determine"; and this provision was re-enacted in the amendments of 1893 and 1907. The charter of 1882 provided that said corporation "may make and execute necessary by-laws, rules, and regulations for the proper management of said society and its property; *provided*, such by-laws, rules, and regulations shall not be inconsistent with the general laws of this state." It further provided that the resolution of incorporation might be amended or repealed at pleasure. The amended charter of 1889 provided that "said corporation . . . shall have power to make and adopt a constitution and by-laws, rules and regulations . . . for the management and protection of its property and funds, and . . . may from time to time alter and repeal said constitution, by-laws, rules, and regulations, and adopt others in their place, provided the same is legally done"; and this provision was re-enacted in the amendments of 1893 and 1907.

The plaintiff Mr. Kane became a member in 1885, and there was issued to him a benefit certificate for $1,000. His application for membership recited: "I will conform to and abide by the Constitution and Rules of this Council and of the Order, which are now in force,

or· may be hereafter adopted by the proper authority."

The certificate of membership provided that its issue should not exempt the holder from any duty or obligation arising out of present or· future laws of the Order.

From its organization to 1886, death claims were met by assessments of $1 upon each insurance member. In 1886, and in 1891, the method of assessment was changed and rates based on age adopted.

In 1892 a by-law was passed requiring each member to pay, in addition to assessments, $5 for each $1,000 death-benefit carried, and these sums were deposited in a Mortuary Reserve Fund. It was adopted for the purpose of accumulating a reserve to meet mortuary losses in excess of those estimated under the American Experience Table.

Said fund was held "for the purpose of paying such mortuary claims in any one year, as are over and above the ordinary number of Mortuary Claims (based upon the American Experience Tables), as may occur by reason of epidemics or other extraordinary causes and events."

The finding recites that the "fund was created and raised for the purpose of aiding and supporting the plan and rates of assessment then in force, in times of pressing necessity, as by its provisions is shown." Upon the discontinuance of this by-law in 1901, this fund amounted to $165,365.

Prior to 1898 there were accumulations from the ordinary assessments, the excess of which, over $20,000, was duly transferred to a Surplus Death Benefit Fund, subject to the regulations and restrictions of the Mortuary Reserve Fund, except it was provided that said surplus might be used at any time to meet ordinary death claims when the regular assessments were insufficient. This fund, on January 1st, 1902, totaled $405,754.41.

No contributions to either of said funds have been made on or after said date.

The rates in effect prior to said date were not sufficient, without levying extra assessments, to enable the defendant to pay death benefits in force, as the same should arise.

On January 1st, 1902, under a by-law passed in 1901, a so-called step-rate plan became operative. This plan, as advised by an actuary, assessed members in classes according to their ages up to sixty years of age, for each five years' mortality expenses that it was calculated those ages would show. The intent of this plan was to meet all future death losses without extra assessments, and to provide an adequate surplus for this purpose. Assessments on those sixty years of age and over were on a level whole-life basis. All term rates were increased in order to reduce the assessments on those sixty years and over.

On said January 1st, 1902, a by-law established a "Mortuary Reserve Fund of the Knights of Columbus," and provided that "said fund shall consist of all moneys and securities of the Death Benefit Fund in excess of $25,000," and that moneys could be drawn from this fund only "in case of emergency, to pay death claims after the other funds applicable thereto have been exhausted." The by-law further provided that "all moneys and securities standing to the credit of the Surplus Death Benefit Fund and the Mortuary Reserve Fund on the first day of January, 1902, shall be placed to the credit of the Mortuary Reserve Fund." Pursuant to said by-law said funds were transferred to the new "Mortuary Reserve Fund" on said date.

Said by-law relating to the transfer of said funds was first noticed and approved at and by the National Council of the Order at its meeting of August 17th, 1901. All of the said by-laws were duly passed. The validity

of the step-rate plan by-law is challenged by the complainants because of lack of power to adopt the same.

Section 8 of the by-law creating the Mortuary Reserve Fund, provided that no change, modification, or amendment, or any final disposition of such fund, should be made unless a notice, in writing, of such change, amendment, or modification, be lodged and approved at and by the Annual Board of Government meeting next preceding. Prior to June 1st, 1898, this section was repealed.

Under said plan a surplus of more than $500,000 has been collected; two regular assessments of $80,000 each, under advice of said actuary, have been omitted.

The mortality of members under forty-five years has been less than estimated, and of those over forty-five, more.

Under each of said plans and rates special assessments might be levied to meet the excess of death claims over regular assessments, and under the by-law of 1886 three such special assessments were levied.

Since January 1st, 1902, it has not been necessary to make special assessments, or to use any funds except those from ordinary assessments, to meet the death claims.

The membership and amount of insurance in force January 1st, 1902, has been and is sufficient to assume a fair average mortality experience from year to year.

The rate of assessments under said plan appears, from experience to date, to be adequate to enable the defendant to pay all certificates in full as they mature by the deaths of the members, without relying upon the funds in suit.

In fixing the rates under the step-rate plan the actuary considered that the death losses in some one of the early years might exceed the regular assessments before the plan had accumulated a sufficient reserve

to meet such contingency, and thus cause a panic among the members; and he regarded these funds as a safeguard against risk of danger in this regard.

Under said plan and rates the plaintiff and those whom he represents were required to pay the same rates, fixed at their attained ages, as if they were newly admitted to membership, and thereby to make the same contributions to the new Mortuary Reserve Fund as members thereafter admitted at those respective ages.

The plaintiff and those he represents have paid all assessments levied without objection or protest until this action, except that on numerous occasions they have protested against the failure to apportion and apply the fund in suit to reduce the assessments of the contributing members at and over sixty.

On May 20th, 1909, said Kane made demand for an accounting or application of his share of the funds in suit, which the defendant refused. None of the said funds have been returned to said Kane and those he represents, otherwise than by the omission of said assessments, which was common to all members admitted before or after January 1st, 1902.

On May 30th, 1903, said Kane received and retained a new death benefit certificate, but did not surrender his original certificate.

Said Kane represents, for the purpose of this action, all insurance members joining the defendant prior to January 1st, 1902; and the defendant Henry B. Cleary represents, for the same purposes, all insurance members joining said Order on and after January 1st, 1902.

It is feasible to make a distribution and application of the funds in suit among and for the benefit of the beneficiaries named in the by-laws under which the same were contributed and for the benefit of the contributors of the same, in such manner as to carry out the purposes of the said by-laws.

*Miles M. Dawson* of New York, with whom were *A. C. Harwick* of New York, *John J. Phelan* and *John J. Cullinan,* for the plaintiffs.

*Joseph C. Pelletier* of Boston, and *William Kennedy,* with whom was *Francis T. Leahy* of Boston, for the defendants.

WHEELER, J. This is an action by contributing members of a fraternal beneficial order to two reserve funds of the Order, to secure, upon a reservation, an answer to the questions (1) whether the Order holds these funds in trust for their benefit, and (2) whether there should be an accounting and distribution of such funds.

Question one is not, in form, the question of the reservation, but is involved in it and is the real question argued before us.

The contract of insurance of the plaintiffs was determined by the constitution and laws of the defendant corporation as amended from time to time and the agreements made thereunder between them and the defendant. *Coughlin* v. *Knights of Columbus,* 79 Conn. 218, 220, 64 Atl. 223; *O'Brien* v. *Brotherhood of the Union,* 76 Conn. 52, 55, 55 Atl. 577.

The charter expressly gave the Order the right to "make and execute necessary by-laws .... for the management of said society and its property;" it was granted subject to amendment, and an amendment in 1889 re-enacted in subsequent amendments, gave it power to alter and repeal said constitution, by-laws, rules, and regulations. The applicant for membership agreed to conform to and abide by the constitution and rules of the Council, and of the corporation, which were then in force, or which might thereafter be adopted by the proper authority. The membership certificate re-

cited that it was issued subject to his compliance with present or future laws.

The power of amendment thus reserved gave the Order the right to change its laws, so long as these were not contrary to law or unreasonable; and the terms of the contract of insurance with its members made such changes a part thereof. *Gilmore* v. *Knights of Columbus*, 77 Conn. 58, 61, 58 Atl. 223; *Reynolds* v. *Royal Arcanum*, 192 Mass. 150, 78 N. E. 129. The promise of the member is to abide by all by-laws then existing or thereafter adopted which carry out the purposes of the Order or help fulfil its obligations arising through its contracts of insurance.

Its reserved power gave it no right to divest, impair, or disturb rights once vested in its members, for such a by-law would be unreasonable.

The statutes of the State contemplate the payment of benefit certificates from surplus or reserve funds derived from assessments. The charter as amended in 1889, and re-enacted in subsequent amendments, authorizes the creation and maintenance of reserve or surplus funds in support of its benefit certificates. Pursuant to its authority, it adopted a by-law in 1892, providing for a "Mortuary Reserve Fund." Subsequently it established a further reserve or surplus fund, denominated a "Death Benefit Fund." The creation of these reserve funds was clearly within the power of the Order. This the plaintiffs admit, and in view of the inadequacy of its rates of insurance the Order would have failed in its duty to its members had it neglected to establish a reserve. The funds so accumulated are trust funds of which the defendant is the trustee, and the execution of the trusts is within the care of a court of equity. *Ryan* v. *Knights of Columbus*, 82 Conn. 91, 93, 72 Atl. 574; *Grand Lodge* v. *Grand Lodge*, 81 Conn. 189, 205, 70 Atl. 617; *Fawcett* v. *Iron Hall*, 64 Conn.

170, 174, 184, 29 Atl. 614. The Mortuary Reserve Fund was held in trust to pay death claims which "may occur by reason of epidemics or other extraordinary causes and events." The Death Benefit Fund was held in trust "to meet ordinary death claims when the regular assessments may not be sufficient." The Mortuary Reserve Fund was intended to meet extraordinary demands; the Death Benefit Fund was to meet ordinary demands.

The plaintiffs rest their argument upon the foundation that the purpose of these trusts was the accumulation of funds "for the exclusive benefit of the contributors and of their beneficiaries." We think this an incorrect statement of the purpose. The intent was to create permanent funds of continuing life in support of the liability incurred and to be incurred through the death-benefit certificates issued by the Order. Contributors to the funds have an interest and a property interest in them, through their right to designate the beneficiary and secure the transfer to that beneficiary of a valuable property, and through their right to compel the execution of the trusts to their purposes. The reserve adds to the security of their contract of insurance, and makes more valuable their rights as certificate-holders. While the Order endures and the trusts exist and the contributors fulfil their contracts of insurance, their interest in these funds is limited to the right to endow their beneficiaries and compel the preservation of the funds and the maintenance of the trusts, upon which may ultimately rest the solvency of the Order and the safety of its contracts of insurance. *Grand Lodge* v. *Grand Lodge*, 81 Conn. 189, 205, 70 Atl. 617; *O'Neill* v. *Supreme Council A. L. of H.*, 70 N. J. L. 410, 418, 57 Atl. 463; 1 Bacon on Benefit Societies (3d Ed. 1904) § 237, p. 530. To render aid and assistance to their members, not only to those contributing to the

fund but to all who might become members during the life of the funds, was their purpose. Their underlying purpose was protection to their members in securing the ultimate payment to their beneficiaries of their death-benefits.

The statement in the finding, that the "Mortuary Reserve Fund was created and raised for the purpose of aiding and supporting the plan and rates of assessments then in force, in times of pressing necessity, as by its provisions is shown," lends support to the claim that this fund was to aid and support the plan and rates of assessments then in force; but we think the general statement of the finding is controlled, as it needs must be, by the limitation, "as by its provisions is shown." The plan gave the right to amend its own laws so long as the amendments were not unreasonable. It was neither unreasonable nor arbitrary to change a system of rates which would better promote its ability to carry out its contracts. The purpose was not to support a present plan of rates, nor one for the exclusive benefit of the contributors, but to secure and maintain surplus funds available in certain contingencies for the payment of death-benefits, thus adding to the financial stability of the Order, and relieving the contributors from the payment of extra assessments in times and amounts liable to prove burdensome to the members. The rates of assessment prior to 1902 were not sufficient to meet outstanding benefits as they might mature. The plan was based upon age, but not classified on sound insurance principles. To meet the benefits as they matured and place the insurance contracts of the Order upon a sound system, the step-rate plan was adopted to take effect January 1st, 1902, under which the assessments were graded by a progressive age scale in five-year periods up to sixty years of age, and after such period making the rate a level rate.

Before, the young paid too much and the old too little; the change resulted in an equalization of payments proportional to risk, and compelled the insured under sixty to pay a part of the cost of insurance of members becoming sixty years of age.

The charter power to create a reserve and issue death-benefits, furnished the authority to make its contracts of insurance capable of fulfillment in accordance with sound insurance principles, by charging adequate rates and providing proper security for the performance of its contracts through the accumulation of funds to meet the contingency of unexpected losses. The reservation of the right to amend its by-laws gave the Order the right to make all reasonable changes which it might deem wise in order to fulfil its contract obligations.

We do not understand the plaintiffs contest either the right of the Order to change its rates and adopt the step-rate plan, or the reasonableness of the plan; nor do we think this could have been successfully done. They do contend that the plan was not legally adopted, since the notice of its proposal had not been duly given under the laws of the Order. We find no provision in the laws of the Order, so far as they appear in the finding, requiring notice to be given of the proposed adoption of the by-law. Section 8 of the by-laws of 1892 had been repealed. If this provision had been in existence at the time of the adoption of the step-rate plan, these plaintiffs are in no position to invoke it. The plan has been in force since January 1st, 1902; it is too late to attack such an irregularity. Nor could these plaintiffs now secure the aid of a court of equity. They have continued their membership, actively shared in this plan of insurance, and done nothing in denial of it except enter an occasional protest for the failure to apportion the funds in reduction of assessments upon them.

Since the power of revocation was not reserved, the Order may not revoke these trusts nor does it invoke such a right. On the contrary, its claim is that these were trust funds which may not be and have not been diverted from the purposes of the trust and which have not failed by their abandonment, but still exist devoted to the same purposes and objects under the step-rate plan as before.

The contributors contend that the trusts have failed, since their purpose has been abandoned and the funds been diverted. They point out that contributions to these funds have ceased and assert that the finding substantiates that these funds are not needed to pay death-benefits, as the new plan amply provides for all contingencies.

These trust funds have been transferred to a common fund to which all surplus accumulations under the new plan go. If the purpose of the new fund is that of the old funds, contributions to them have not ceased but are going on.

The finding does not state that these trust funds will never be needed for the purposes of the trusts; it states facts from which one may reason that these funds will not be necessary since the present rates bid fair from experience to provide an ample surplus to meet death claims and preserve the solvency of the Order. Whether they will continue to do so in time of emergency we cannot know. This court cannot find facts, and, in the absence of a specific finding that these trust funds will never be required for the purposes of their creation, we cannot act upon that conclusion.

It is elementary that trust funds cannot be diverted from the purposes of their creation. *Koerner Lodge* v. *Grand Lodge*, 146 Ind. 639, 640, 45 N. E. 1103. And this the Order concede, for they contend that "no change in purpose was made by the transfer." We can readily

ascertain whether there has been a diversion of these trust funds by comparing the purposes and uses of the respective funds. The Mortuary Reserve Fund of the step-rate plan was available "in case of emergency to pay death claims after the other funds applicable thereto have been exhausted." While the plan provided for special assessments in addition to the regular ones, this Reserve Fund was available when the funds raised in the ordinary way had been exhausted. When ordinary death claims are in excess of current regular assessments, this fund may be drawn on. It was for such purpose the Death Benefit Fund was created. When some extraordinary cause occasions the maturity of many death claims in excess of the ordinary resources, this fund may be drawn on. It was for such purpose the Mortuary Reserve Fund of 1892 was created. It was not available for ordinary death losses, nor for the excess of losses happening through ordinary causes. All of this fund, the part arising through the accumulation of the step-rate plan and the part arising from the transfer to it of these trust funds, is available for any deficit either to meet ordinary claims or extraordinary claims. The surplus Death Benefit Fund might properly be devoted to such purposes. The Mortuary Reserve Fund could not. Its sole purpose was to meet the death losses from extraordinary causes; it could not be used to meet death losses arising in ordinary course. The transfer of this Mortuary Reserve Trust Fund to a fund applicable to either the purpose of the Mortuary Reserve Fund, or that of the Surplus Death Benefit Fund, was a violation of the purpose of the fund and constituted an illegal diversion of the trust.

Though this Mortuary Reserve Fund has been illegally diverted, it does not follow that its contributors are entitled to its distribution, or to have it set apart for their ultimate benefit. In any event, it must be set apart and

returned to the original Mortuary Reserve Fund and held for the purposes of its creation. When it definitely appears that its purposes have failed, or that the fund will never be required to meet the contingency of its existence, that is, that the Order will never suffer unusual losses from extraordinary causes or events, it will be proper to seek the aid of a court of equity when the corporation has refused or neglected, on request, to distribute this fund. When and how this fund shall then be distributed may well be left for determination when that situation arises. Courts are reluctant to interfere with a matter of internal management of a benefit association unless the order itself refuses or neglects to perform its duty. *Wright* v. *Minnesota M. L. I. Co.*, 193 U. S. 657, 663, 24 Sup. Ct. Rep. 549; *Fullenwider* v. *Royal League*, 73 Ill. App. 321, 336.

The Superior Court is advised that each of the questions reserved for the advice of this court is to be answered in the negative.

No costs will be taxed in this court.

In this opinion the other judges concurred.